# United States District Court

_Southern_ _____ DISTRICT OF _Florida_

U.S.A v. LaFontant

## EXHIBIT AND WITNESS LIST

CASE NUMBER: OO·6255-CR-Hurley

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Linnea R. Johnson | Richard Brown for Behnke | Clayton Kaiesec |
| TRIAL DATE(S) 7-8-03 | COURT REPORTER | COURTROOM DEPUTY Emily Guerrero |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | 7-8-03 | | | Detective Octavio Tellez · Miami Dade P.D. |
| ✓ | | 7-8-03 | 1 | ✓ | Affidavit of Darren Jolly |
| ✓ | | 7-8-03 | 2 | ✓ | Deposition of Det. Tellez |
| ✓ | | 7-8-03 | 3 | ✓ | Deposition of Darren Jolly |
| ✓ | | 7-8-03 | 4 | ✓ | Copy of Drivers License (Jamal Paul Delva) |
| ✓ | | 7-8-03 | 5 | ✓ | Copy of " " (Franki Lafontant) |
| | ✓ | 7-8-03 | 1 | ✓ | Post Trial of Darren Jolly |
| | | | | | |

\* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

STATE OF FLORIDA,
       *Plaintiff,*

vs.

Jimmy Casimir
aka: Mcharry Lafontant,
       *Defendant(s)*

CASE NO: F02-24455
JUDGE:    Sigler

## AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared, Darren Jolly, who being duly sworn, deposes and says that the facts stated below are true and correct.

1.  On the early morning hours of July 27, 2002, I along with Leslie Estimable went to the "Take One Lounge" on NE 79th Street and 3rd Avenue in Miami Dade County, Florida. Leslie Estimable was driving my vehicle to the "Take One Lounge."

2.  When I arrived at the "Take One Lounge" with Leslie Estimable there was a white sports utility vehicle parked outside the lounge. Certain individuals inside the sports utility vehicle began shooting their firearms at my vehicle.

3.  Leslie Estimable and myself immediately fled the lounge with my vehicle.

4.  We stopped at an Amoco Gas Station located at 595 NW 95th Street, Miami, Florida. We had to stop in order to fix a flat tire.

5.  While fixing the flat tire Meeka Menys and Michele Haynes arrived at the gas station in order to assist us.

6.  While at the gas station a white sports utility vehicle pulled up. The front and rear passenger windows were down and the front passenger and the rear passenger began shooting their firearms at myself, Leslie Estimable, Meeka Menys and Michele Haynes.

7.  The front passenger was Mcharry Lafontant and the rear passenger was Frankie Lafontant. I personally know both of these individuals and they were both shooting their firearms.

8.  I was in fear of my life. I began to run with Meeka Menys and Michelle Haynes. Leslie Estimable was also running for his life. While we were running they were still firing at us.

9.  This affidavit was prepared by me with the assistance of Assistant State Attorney, Roger Cabrera for use in an Arthur Hearing. It is not intended to be a complete summary of the events in question and does not necessarily contain every fact or detail that I may testify to if called as a witness at trial.

_____
AFFIANT

GOVERNMENT
EXHIBIT
0:00 CR06255-001

STATE OF FLORIDA, COUNTY OF MIAMI-DADE:

Sworn to and subscribed before me this ___12___ day of _Septembr_ 200_, by _Lflntcs Jclly_

_____
NOTARY PUBLIC, STATE OF FLORIDA

Personally Known _____

Produced Identification, type: ___SS -___
_545 - 449 356_

Sandra E. Lawrence
Commission # DD 008435
Expires March 11, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO.: F-02-24455

COPY

STATE OF FLORIDA,

     Plaintiff,

vs.

JIMMY CASIMIR a/k/a
MCHARRY LAFONTANT,

     Defendant.

_____/

State Attorney's Office
1350 N.W. 12th Avenue
Miami, FL 33136
November 5, 2002
1:55 p.m.

DEPOSITION OF DETECTIVE OCTAVIO TELLEZ

GOVERNMENT
EXHIBIT
2
0:00 CR O6255-001

Taken before **SOFIA CHEDIAK**, Court Reporter and

Notary Public, pursuant to Notice of Taking Deposition

filed in the above cause.

APPEARANCES:


On behalf of the Plaintiff:

        ROGER CABRERA, ASA
        1350 N.W. 12th Avenue
        Miami, Florida  33136


On behalf of the Defendant:

        Haber & Roth, P.A.
        BY:  MARTIN L. ROTH, ESQ.
        1001 Brickell Bay Drive, Suite 1704
        Miami, Florida  33131




                    I N D E X



WITNESS                          DIRECT   CROSS   REDIRECT

DETECTIVE  OCTAVIO TELLEZ

(By Mr. Roth)                       3

1    Thereupon,

2                    DETECTIVE OCTAVIO TELLEZ,

3    was called as a witness by the Defendant and, having

4    been first duly sworn, testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. ROTH:

7         Q.   Sir, please state your name for the record.

8         A.   Octavio Tellez.

9         Q.   Detective Tellez, is it correct you're a

10   detective with the Metro-Dade Police Department?

11        A.   Yes.

12        Q.   How long have you been a police officer?

13        A.   I started the academy in September of '97,

14   and I got sworn on April 29, '98.

15        Q.   How long have you been a detective with

16   Miami-Dade?

17        A.   Since January 21st, 2002.

18        Q.   Okay.  How is it that you first became

19   involved in the shooting incident that occurred on or

20   about July 27, 2002 and that ultimately resulted in

21   the arrest of Jimmy Casimir, who is also known as

22   McHarry Lafontant?

23        A.   I heard the call go out on the air, and then

24   when I found out it was an actual shooting, I

25   responded to the scene.

```
 1        Q.  And where were you when you got the call?

 2        A.  I was on State Road 112 and 27th Avenue.

 3        Q.  That's in Dade County?

 4        A.  Yes.

 5        Q.  And were you there in relation to another

 6   crime scene, or was that --

 7        A.  I was on my way home.

 8        Q.  You were on your way home?

 9        A.  Yes.

10        Q.  Basically, you turned around and you went to

11   the scene?

12        A.  Yes.

13        Q.  And what did you find when you got to the

14   vicinity of N.W. 95th Street and N.W. 6th Avenue --

15             Is that right?

16        A.  Yes.

17        Q.  What did you find?

18        A.  The scene was roped off by several county

19   officers, and there was Metro-Dade Fire Rescue trying

20   to treat a victim for a gunshot wound.

21        Q.  And did you later learn the name of that

22   person who was wounded?

23        A.  Yes.

24        Q.  Is that Leslie Estimable?

25        A.  Yes.
```

1    Q.    Something like that?

2    A.    He's also known as Leslie Joseph.    He uses

3  both names.

4    Q.    What did you do once you got to the scene?

5    A.    I attempted to separate the victims and

6  attempted to keep them separated by different

7  officers.    I spoke to them individually.    I also

8  requested Crime Scene, which took a little bit of time

9  to respond.

10    Q.    Had the victims given statements to any

11  law-enforcement person prior to your arrival?

12    A.    Formal statements, no.

13    Q.    Or just any kind of a verbal description of

14  what had happened.

15    A.    Yes, to the initial officers.    And there was

16  a be-on-the-lookout put out for -- I believe it was a

17  white SUV or gray SUV.

18    Q.    I saw a report in here that was written by

19  Officers Acosta and Larson.

20    A.    Yes.

21    Q.    Were they the initial officers on the scene?

22    A.    I don't recall that they were the first

23  officers, but they were the officers that were

24  assigned the report.

25    Q.    Okay.    And if you know, in their report the

 1    statements that they attribute to the various

 2    witnesses or victims, are those statements that they

 3    received, or is this information that they received

 4    from other officers?

 5         A.  I don't recall what they wrote on the report.

 6         Q.  When you got to the scene, did anybody step

 7    up and brief you on what law enforcement already knew?

 8         A.  I don't recall if anybody actually -- I

 9    arrived within five minutes of it, and I started doing

10    my own interviews.  I arrived when they were treating

11    the victim to the gunshot wound, and I don't recall if

12    anybody put me aside and told me what was going on.

13         Q.  So, you may have arrived literally within

14    minutes of the incident occurring?

15         A.  Yes.

16         Q.  Who did you speak to first, as far as victims

17    or witnesses?

18         A.  I attempted to speak to Leslie Joseph, but he

19    was in shock, so I couldn't speak to him.

20         Q.  Okay.  Leslie Joseph, is that the person that

21    fire rescue was attending to?

22         A.  Yes.

23         Q.  And what could you see, as far as injuries?

24         A.  I couldn't see any.  I just saw blood on his

25    shirt and his neck area.  I couldn't really -- I was

 1  told by fire rescue there was an apparent gunshot

 2  wound to the neck area.

 3       Q.   Okay.

 4       A.   They were asking him names and stuff, and he

 5  seemed confused when he was being treated, so I

 6  couldn't get anything from him.

 7       Q.   So, you weren't able to conduct an interview?

 8       ·A.   At the scene with him, no.

 9       Q.   So, what next did you do?

10       A.   I spoke to Officer Acosta, who told me they

11  had one of the females that was in the vehicle, which

12  turned out to be Mecka Menys, in his back seat, and

13  she was a witness, possible victim.  He also told me

14  there was damage to the Amoco station.  Then I went on

15  and started looking at the scene.

16       Q.   Before we talk about what the witnesses or

17  victims told you, maybe you could describe what you

18  saw at the scene that was pertinent to your

19  investigation.

20       A.   Okay.  There was over ten casings near 6th

21  Avenue, which the address of the place is 595 95th

22  Street.  There were three different kinds of casings.

23  There was some damage to the gas station all the way

24  to the inside of the cooler and damage to the gas

25  pumps.  There was -- I couldn't tell if it was new

1  damage or old damage -- to the vehicle in the scene.

2  It looked like maybe a possible stray bullet that hit

3  it.  There was also a blood stain on the northeast

4  corner in front of the gas station which appeared to

5  be where Leslie Joseph came to the ground.

6       Q.  Okay.  And you said there were three types of

7  shell casings?

8       A.  Yes.

9       Q.  And based on your experience, were you able

10  to distinguish the differences between the three

11  casings?

12       A.  Yes.

13       Q.  What could you tell me about the three

14  different shell casings?

15       A.  It was a .9 millimeter, it was a .45 and a

16  .38.  I think it was a .38.  I just remember there was

17  three different kinds of casings.  The crime-scene

18  detective that came out gave me the property receipt,

19  and it was three different kinds of casings.

20       Q.  A .380, is that the same as --

21       A.  .380.  There you go.

22       Q.  Okay.  Of course, they were collected and

23  preserved as evidence?

24       A.  Yes, by the crime-scene technician.

25       Q.  Any firearms recovered?

1          A.   There was a firearm recovered in the inside

2     of Michelle Haynes' vehicle.

3          Q.   What kind of vehicle was she driving?

4          A.   It was an SUV.  I would like to say it was an

5     Explorer, but I would have to look at the report.

6               MR. CABRERA:  Detective Tellez, if you have

7     to look at your report, look at it.

8     BY MR. ROTH:

9          Q.   During the deposition, you should feel free

10    to look at anything that might help you or assist you

11    in answering the question.  The only thing I ask is

12    you indicate "I'm going to look at my report" or

13    whatever you're going to look at, you would just say

14    on the record.

15         A.   It was a 1998 Ford Explorer, four doors.

16         Q.   The .9 millimeter you recovered was from the

17    interior?

18         A.   I did not recover it.  It was Officer Larson

19    and Acosta.  I got the consent from Michelle Haynes,

20    and they recovered the gun and impounded it.

21         Q.   And from where in the vehicle was the firearm

22    found?

23         A.   I would like to say it was the front seat,

24    but since I didn't pick it up, I --

25         Q.   You think I should ask Larson or Acosta?

10

1    A.    Yes.

2    Q.    The .9 millimeter -- was there any indication

3    that it had been recently fired?

4    A.    I'm not an expert.  I didn't examine the gun.

5    Q.    If you fire a .9 millimeter, does the gun get

6    hotter than normal?

7    A.    Yes.

8    ·Q.    Did you feel

9    A.    I didn't feel the gun.

10    Q.    Were you concerned about fingerprint issues

11    and things like that?

12    A.    It was impounded, and whatever tests were

13    done, were done.

14    Q.    If a gun is fired, can you sometimes detect

15    a smell?

16    A.    I guess you can.

17    Q.    Did anybody see if the gun had any kind of an

18    odor that might indicate it had been recently fired?

19    A.    I think any gun that has ever been fired

20    would have a smell.  I don't recall Officer Larson or

21    Officer Acosta coming up to me and telling me it had

22    just been fired.

23    Q.    It had a clip in it?

24    A.    I would have to look at the property receipt.

25    Like I said, I was more concerned about the victim.

11

1      Q.   My understanding is it had a clip in it but

2  it was empty.

3           Do you recall that?

4      A.   It may be true.

5      Q.   Okay.

6      A.   I don't know if I have that property receipt.

7           Yes, I do.  No bullets.

8      Q.   And is it correct that when the gun was

9  recovered, the safety was off?

10     A.   I don't know.

11     Q.   And that the hammer was bad?

12     A.   You would have to ask Officer Acosta or

13  Larson.

14     Q.   Was there anything else about the scene that

15  you noted and preserved, as far as evidence in the

16  case?

17     A.   What do you mean?

18     Q.   You told me about shell casings and blood

19  being in a certain spot, and you noted damage that

20  could be from projectiles fired during the incident.

21     A.   Yes.  Crime Scene took photos of the scene,

22  the inside of the Amoco station.  Like I said, the

23  vehicle was not impounded.  The Explorer was not

24  impounded.  It was Michelle Haynes, she cooperated

25  with me.

1      Q.  If I understand it right from reading reports

2  and statements, allegedly one of the victims' vehicles

3  had a flat tire, and it was being changed.

4      A.  Yes.

5      Q.  Did you see the vehicle that had a flat tire?

6      A.  Yes.

7      Q.  And was there a jack out or anything

8  indicating that --

9      A.  It had a flat tire, and the jack was out.  It

10  looked like it was being changed.

11      Q.  And Crime Scene may have photographed that?

12      A.  I believe they did.

13      Q.  Was there any indication in the victim's

14  vehicle that it had been struck by any projectiles?

15      A.  You're talking about the Explorer or the

16  small vehicle?

17      Q.  I'm talking about the small vehicle.  If I

18  remember right, it was a .92 red two-door.

19      A.  I couldn't tell if it had been previous

20  damage or damage at the scene.  There was, I would

21  like to say, broken glass -- not broken glass, a

22  broken window -- but I couldn't see glass on the

23  floor.  I couldn't tell if it had occurred there or

24  not.

25      Q.  In other words, it could have happened in

1     previous days?

2         A.   It could have happened in previous days.

3         Q.   And whose vehicle was that, the red Chevrolet

4     Barreta?

5         A.   It was under the control of Darren and

6     Leslie, but the owner was not there.

7         Q.   Do you know who the owner is supposed to be?

8         A.   We ran it, and -- honestly, I don't remember,

9     but I'm sure I noted it somewhere -- or someone noted

10    it somewhere.

11        Q.   As far as I understand, when I ran the

12    license tag, it came out to a Ralph John Langom

13    (phonetic) in Hallandale, Florida.

14        A.   Okay.

15        Q.   Did you speak to him?

16        A.   Not that I can recall.

17        Q.   Were you ever able to determine how it was

18    that that vehicle was in the possession or control of

19    Darren Jolly or Leslie Estimable?

20        A.   Darren told me that they had loaned it to

21    him.

22        Q.   That Mr. Langom (phonetic) had loaned it to

23    him?

24        A.   I don't recall if he used that name.

25        Q.   Okay.  I wanted to ask you about the

14

```
 1    witnesses that were at the crime scene that you were

 2    able to speak to.

 3              You first spoke to Michelle Haynes, is that

 4    correct?

 5         A.   The first person I spoke to was, I believe,

 6    Jack --

 7         Q.   Uddin?

 8        ·A.   No.

 9              He apparently was at the light on his

10    motorcycle, and he saw the incident, and he kept

11    trying to go under the rope, under the yellow line,

12    telling me that he was a witness.

13         Q.   Okay.  I think you took a statement from him.

14         A.   Eric Haley.

15         Q.   So, he was the first individual you spoke to?

16         A.   Briefly, before I got a statement from him.

17         Q.   And what was he able to tell you?

18         A.   I would have to read it from the statement.

19         Q.   That's what I was going to ask you.  Is his

20    statement complete?  In other words, he wrote out a

21    fairly detailed statement?

22         A.   Yes.

23         Q.   Is that consistent with what he was able to

24    tell you verbally?

25         A.   Yes.
```

15

1    Q.   Was he able to give you a description of any

2    vehicle that shots were fired from toward the victim?

3    A.   Description of the vehicle?

4    Q.   Yes.

5    A.   He did.  I don't recall if he put it on the

6    statement.

7    Q.   What did he tell you about the vehicle that

8    the shots came from?

9    A.   It's straight from the report, because I

10   don't remember exactly what he told me.

11   Q.   In other words, if he gave you a description,

12   it would be whatever you attributed to him in your

13   report?

14   A.   Yes.

15   Q.   And what about as far as a description of the

16   people who are the shooters, was he able to give any

17   physical description of them?

18   A.   No.

19   Q.   Who did you next speak to at the crime scene?

20   A.   I believe it was Michelle Haynes.

21   Q.   And what was Michelle able to tell you?

22   A.   That she was coming there with Mecka Menys to

23   help out Mecka's boyfriend.

24   Q.   Which boyfriend, Darren, or --

25   A.   Yes.

16

1      Q.  Darren's girlfriend.  I don't know, that's

2  why I'm asking.  I really don't know who is who.

3      A.  Michelle told me she was with Mecka, and they

4  were going there to help out Mecka's boyfriend,

5  Darren.

6      Q.  Oh, okay.

7          And what did she tell you happened?

8      A.  She said they pulled up there to help him

9  with the flat tire, and all of a sudden shots rang

10  out.

11      Q.  And was she able to give a description of who

12  the shooters were?

13      A.  At that moment, she didn't.

14      Q.  What was she able to tell you about the

15  shooters at that moment?

16      A.  She was really scared.  She basically didn't

17  want to be there.  She told me that the shots rang,

18  she got scared, and she attempted to leave, but she

19  didn't want to leave everybody, so they were putting

20  Leslie into the vehicle to take him to the hospital

21  when the police pulled up.

22      Q.  Did she later give you a better description

23  of the shooters?

24      A.  No.

25      Q.  So, basically, up to today, she's unable to

1    give any description as to the people who did the

2    shooting?

3        A.   To me.

4        Q.   Do you know whether before speaking to

5    you she had previously told officers Acosta and Larson

6    that the shooting had occurred before she even got

7    there?

8        A.   In the statement, I think she wrote that the

9    vehicle that they were in, the '92 red car, may have

10   had previous damage from the shooting.

11       Q.   But do you know whether she told --

12       A.   I don't know.

13       Q.   -- Acosta and Larson that she got there after

14   all the shooting was over?

15       A.   I don't recall that.

16       Q.   Was there anything else that she was able to

17   tell you that assisted you in your investigation?

18       A.   What she told me basically was in the report,

19   in the statement.

20       Q.   The only other thing I see in the report is

21   she told you about the .9 millimeter.

22       A.   Yeah.

23       Q.   And she said that that belonged to Darren?

24       A.   That she was upset with Darren.

25       Q.   And why was she upset with him?

1      A.  She kept on saying that she shouldn't have

2  been there.

3      Q.  And was she upset with regard to that .9

4  millimeter, or she was just upset --

5      A.  I think she was upset about the situation she

6  had been put in.  That's my opinion.

7      Q.  That his call exposed them to this type of

8  situation?

9      A.  That's what I took from it.

10     Q.  And she gave consent to search her vehicle?

11     A.  Yes, written consent.

12     Q.  And that's where the firearm was found,

13  somewhere in the front seat area of her vehicle?

14     A.  I believe so.

15     Q.  And she told you that she saw Darren Jolly

16  put the gun inside her car?

17     A.  She didn't verbally tell me.  When she

18  finished the statement, she said, I need to add

19  something to it, and I gave it back to her, and that's

20  when she added the second part of the statement.

21     Q.  So, in your report -- what do you guys call

22  these reports?

23     A.  Supplemental.

24     Q.  In the Supplemental Report, you indicate on

25  Page 3 that quote she saw Darren Jolly put the gun

1    inside her car.

2             Was that based on what she told you, or was

3    that based on --

4        A.   Statement.

5        Q.   -- something she wrote out?

6        A.   Yes.

7        Q.   Who did you next speak to after Michelle

8    Haynes?

9        A.   I attempted to speak to Darren Jolly or David

10   Jackson.  He didn't really want to speak to me.

11       Q.   Did you ask him if that was his .9

12   millimeter?

13       A.   No.

14       Q.   It sounds to me like your communication with

15   him at the scene was brief.  If you could just tell me

16   what you saw and --

17       A.   He seemed -- I don't want to say terrified,

18   but he was jumpy.  He was really sweaty.  He just

19   wanted to leave.  I don't know if he thought they were

20   going to come back and shoot him.  Honestly, I don't

21   know what the deal was.  Maybe he thought he was going

22   to be arrested for being involved in the shooting.  He

23   first told me that he would speak to me with a lawyer

24   present only.  So, I left him there, and I came back a

25   little while after, and he said he was going to speak

1    to me.  But he gave me a very short statement,

2    basically like he didn't want to be involved, like he

3    wanted to leave.  He didn't seem very comfortable

4    there.

5        Q.  And in his first statement to you, he

6    indicated that -- you showed me the statement -- I

7    need to get a copy of that.

8            MR. CABRERA:  You should have it.

9            MR. ROTH:  I have everything but that.

10           MR. CABRERA:  But the first statement he gave

11   on the scene.

12           MR. ROTH:  Your detective did show it to me,

13   so I've seen it prior to the depo.

14   BY MR. ROTH:

15       Q.  But in his first statement to you, he's

16   unable to describe who did it either by name or

17   physical description?

18       A.  He did not give me any description.  I

19   believe he said three black guys.

20       Q.  Who else did you speak to after Darren Jolly?

21       A.  Mecka Menys, who was sitting in the back of,

22   I believe, Officer Acosta and Larson's car.

23       Q.  And she gave you a written statement?

24       A.  Yes.

25       Q.  And she also verbally answered the questions

1    that you had?

2        A.  Yes.

3        Q.  Was she able to give you a physical

4    description of the people who did the shooting?

5        A.  I don't believe she did.

6        Q.  And could she identify the shooters by name?

7        A.  No.

8        Q.  What did she tell you happened?

9        A.  Basically, the same as Michelle Haynes.  She

10   was going to go help her boyfriend with a flat tire,

11   and she --

12       Q.  And they got to the Amoco gas station, and --

13       A.  Yes.

14       Q.  Mecka Menys -- were you able to verify that

15   as being her true and correct name?

16       A.  At the scene, I didn't.  I went back to the

17   station, I ran everybody, and I couldn't get a pass on

18   her and I couldn't get a license on her either.

19       Q.  I can't find any identifiers that relate to a

20   Mecka Menys.

21           Do you still have contact with her?

22       A.  Through Darren.

23       Q.  Has anybody given you any other name for her?

24       A.  No.

25       Q.  You can't find like, for example, a driver's

1    license number?

2        A.   I couldn't find nothing on her.   She was the

3    only one that had nothing.

4        Q.   Have you seen her since the day of the

5    shooting?

6        A.   No.

7        Q.   What about Darren Jolly, he told you that

8    he's also known as David Jackson?

9        A.   Yes, I believe he was arrested as David

10   Jackson initially.   I think that's the way it goes in

11   the system.   He will always show as David Jackson, or

12   vice versa he will also show as Darren Jolly, just

13   like Jimmy Casimir and McHarry Lafontant.

14       Q.   Were you able to find identifiers to him

15   under the name Darren Jolly?

16       A.   Eventually, I did.

17       Q.   And what about under David Jackson?

18       A.   It comes out under the same.   If you run

19   David Jackson, it will show him.   If you run Darren

20   Jolly, it will show him.

21       Q.   As far as you know, what do you think his

22   name is, Darren Jolly or David Jackson?

23       A.   I think it may have been David Jackson, but

24   he uses Darren.

25       Q.   So, you think his birth name --

1    A.    May be David Jackson, but he uses Darren

2    Jolly.   You could see in his statement he wrote both

3    names.   I don't know if you have it.   You don't have

4    the first statement, but he wrote both names.

5    Q.    Okay.   And you indicated in your report that

6    he advised you that he's also known as David Jackson?

7    A.    Yes.   I'm showing you the statement, and it

8    shows both names.

9    Q.    Okay.   So, he put David Jackson/Darren Jolly?

10    A.    Yes.

11    Q.    He put David Jackson first?

12    A.    Yes.

13    Q.    And how did he sign the first statement, as

14    Darren Jolly or David Jackson?

15    A.    Darren Jolly.

16    Q.    Were you present when Darren Jolly gave his

17    sworn statement, his affidavit, that was used in the

18    Arthur hearing in this case?

19    A.    No.

20    Q.    Was there anybody else, after Mecka Menys,

21    that you interviewed at the crime scene?

22    A.    At the crime scene, I spoke to -- I don't

23    recall his name.   The owner or the manager of the gas

24    station.   And I got his consent so we can look inside,

25    and take pictures and try to retrieve any bullets.

1      Q.   There is two gentlemen listed on here, there

2  is a San Jay Soon, and there is a Mohammed Uddin.

3      A.   I wouldn't be able to tell you which one is

4  which.  I don't recall.

5      Q.   Are both of those gentlemen associated with

6  the Amoco gas station?

7      A.   Yes, yes.

8      Q.   And did you take written statements from

9  them?

10      A.   No.

11      Q.   And is that basically everybody, other than

12  law enforcement people, that you spoke to at the crime

13  scene?

14      A.   Yes.

15      Q.   What did you next do in the case?

16      A.   I gave a brief synopsis to the crime scene

17  technician when she arrived, Officer Duncan.  She

18  stayed on the scene while I went to the hospital.

19      Q.   Okay.  And what did you do at the hospital?

20      A.   At the hospital, I went in, and I asked to

21  see Leslie Joseph.  I think they told me that wasn't

22  his name, but I told them I was looking for a shooting

23  victim in the neck area, and they had his ID card, and

24  it said Leslie Estimable.

25      Q.   And were you able to see him?

1          A.   Yes.   He was in between taking x-rays.   The

2     technician gave me an opportunity to speak to him.   I

3     introduced myself, gave him my card.   I asked him if

4     he knew anything, who was the shooter.   He said he

5     knew exactly who it was.   He gave me two names.   He

6     said it was McHarry Lafontant and Frankie Lafontant.

7               I told him how did he knew it was them, and

8     he said because they wanted to -- I don't recall if he

9     said "shoot me" or "kill me" reference drugs.

10              I told him, "You don't have to worry about

11    it, I'm not going to arrest you for drugs.   Just tell

12    me what happened."

13              He said that they had a problem.   I asked him

14    if he was for sure that it was them, and he said, yes,

15    it was.   There was a third person in the car, but I

16    couldn't get a name on him.

17         Q.   Now, did he tell you it was them because he

18    was in the dispute with them --

19         A.   He told me about the dispute, but he said he

20    saw them shoot.

21         Q.   That's what I wanted to get at.   Did he tell

22    you that with his own eyes he actually saw them?

23         A.   When he was lying in the x-ray table, he told

24    me he saw them.

25              I asked him, "How do you know it was them?"

1        He told me, "Because I saw them."

2        Q.   So, he saw them shooting towards him?

3        A.   He saw when they pulled up and started

4   shooting.  After that, he started running.  So, I

5   guess he didn't see all of the shots.

6        Q.   And don't let me put words in your mouth,

7   because I don't want to do that, but it seems to me

8   that it is based upon his statement to you at the

9   hospital that you determined that you had probable

10  cause to arrest McHarry Lafontant?

11       A.   You can say that, but I couldn't find them in

12  the computer.  I couldn't find anything on McHarry or

13  Frankie Lafontant.  As he said the name, I couldn't

14  find anything.  So, I had nothing.

15       Q.   Okay.

16       A.   That's pure luck that I saw Officer Cordero,

17  who works Robbery Intervention Detail, about three

18  days later, I would say -- three or four days later --

19  and I asked him if he knew anything about gangs,

20  because one of the things that Leslie told me was that

21  they were in the Zoe Pound.   And Officer Cordero said

22  that he had a book.  He came back to the station,

23  showed me a book -- because I couldn't find a book on

24  McHarry, and I didn't even know if I was spelling it

25  right.  He shows me a book, and under "Lieutenant of

1    Zoe Pound," it said, "McHarry Lafontant."

2          I said, "There we go."  I messed up on the

3    last part of the name.  I looked it in the computer

4    and, sure enough, I found McHarry and Frankie

5    Lafontant.

6          Q.  So, now you've got photographs?

7          A.  I did a stack line-up.

8          Q.  Tell me about that.  I don't know that much

9    about that.  How do you do a stack line-up?

10          A.  I don't want to bad mouth my station, but we

11    have very raw facilities, so I couldn't get pictures

12    lowered down to make a regular line-up, like almost

13    everybody has seen them, eight by eleven.  So, I did a

14    large picture, and I did about twelve pictures of

15    black males with dreds, which was like the picture

16    that I had on McHarry and other black males with very

17    little hair, like Frankie Lafontant.  I got in touch

18    with Leslie.  I went to the hospital, I gave him the

19    stack line-up, changed pictures for him, and when he

20    got to McHarry, he said, "That's him."

21          I pulled it aside, I showed him Frankie.  He

22    said, "That's him."

23          He tried to sign his name legibly, but he was

24    shaking, and he could barely write.

25          Q.  So, you take a stack of photographs --

1       A.   Yes.

2       Q.   -- of people who have some similar

3  characteristics to your suspects?

4       A.   Yes.

5       Q.   And you display the photographs one at a time

6  to your witness?

7       A.   Yes.

8       Q.   And you ask the witness to let you know if he

9  recognizes any of the subjects in the photograph?

10      A.   No.

11           I asked him, "You need to tell me if any of

12  these shot you."   I told him "not if you think, but if

13  you know that they shot you -- if they are the ones

14  who shot you."

15           He said, "I know them."   He picked them out,

16  and he signed them.

17      Q.   Was the stack line-up displayed to anyone

18  else, other than Estimable?

19      A.   It was to Darren Jolly/David Jackson.

20      Q.   Same procedure?

21      A.   Yes.

22      Q.   Was he able to identify anybody?

23      A.   Same identifications.

24      Q.   Were you ever able to find any vehicle that

25  was utilized in the shooting?   I don't mean the

1    victim's vehicle, but the subject's vehicle?

2        A.   No.

3        Q.   And the best description you ever got was a

4    silver or white SUV-type vehicle?

5        A.   Yes.

6        Q.   No make or model?

7        A.   At the scene, I recall it might have been an

8    Explorer.  It might have been some other type.  I

9    didn't want to put down on my report Explorer.  I

10   believe I put SUV.

11       Q.   Okay.

12       Q.   Darren Jolly, does he have a criminal record.

13       A.   He has a criminal past, yes.

14       Q.   What is his past, if you know?

15       A.   I don't have it on me.  I know he has been

16   arrested more than five times, I would say.

17       Q.   Do you know if he has ever been convicted of

18   a felony?

19       A.   Off the top of my head, no.

20       Q.   So, you know he has multiple arrests, but as

21   you sit here today, you don't know whether he has any

22   felony convictions?

23       A.   I would have to have the record in front of

24   me to know.

25       Q.   Darren Jolly, he had like his hand swabs to

```
 1    see if --

 2         A.  Yes.  I haven't received anything yet.  My

 3    department has so many requests -- we've got a memo

 4    about a month ago saying that it would have to be by

 5    request.  They have them, but they haven't processed

 6    them.  We would have to request --

 7         Q.  Through the State Attorneys Office or a court

 8    order?

 9         A.  I've never requested it.  I'll be lying to

10    you if I told you I knew how.

11         Q.  Darren doesn't acknowledge that that is his

12    gun or that he fired it, right?

13         A.  I don't believe he has ever told me that he's

14    the one who fired.

15         Q.  And Leslie has backed off his initial

16    statements to you that McHardy and Frankie were the

17    shooters?

18         A.  Yes.

19         Q.  Now, Darren says that they are.

20         A.  Yes.

21         Q.  So, at least from my point of view, whether

22    Darren is being truthful or not about firing the

23    weapon, is material to the case, because he is a very

24    significant witness in the case.

25              MR. ROTH:  The detective has told me that as
```

1   far as the hand swab of Darren Jolly to look for

2   gunpowder residue, that that evidence has been

3   preserved but not submitted for testing.

4           MR. CABRERA:  Okay.

5           MR. ROTH:  I would like to have it tested.

6           Can it get requested?

7           MR. CABRERA:  Sure.

8   BY MR. ROTH:

9       Q.  As far as the position of the casings at the

10  crime scene, would that be detailed by the crime-scene

11  technician in his report?

12      A.  Yes, yes.

13      Q.  Your major function when you got there, with

14  regard to the casings, was to make note of them and

15  make sure that they stayed where you saw them?

16      A.  The scene is preserved, and it is also the

17  function of Officer Acosta and Larson.

18      Q.  You were notified when McHarry Lafontant was

19  arrested?

20      A.  I put a message to stop him for me.  Officer

21  Ferguson, of the City of Miami, stopped him.  I was

22  notified.  I had two detectives from my station pick

23  him up at City of Miami mini-station, I believe.  He

24  came back to our station, and I interviewed him at the

25  Northside Station.

1      Q.   When he was arrested, he was arrested on your

2    be-on-the-lookout?

3      A.   Yes.

4      Q.   Not for some separate or independent crime?

5      A.   No.   He was detained by City of Miami and

6    brought over.

7      Q.   Did he speak with you?

8      A.   He spoke with me.   I couldn't really

9    interview him.   He said I can speak to his lawyer.

10     Q.   Did he make any statements at all that were

11   pertinent to the case?

12     A.   He did make statements afterward.

13     Q.   Okay.

14     A.   When we first got there, I offered him any

15   food or Coke or water.   He wanted a Coke.   I gave him

16   a soda.   I read him Miranda.   He said I could speak to

17   his lawyer.   So, that kind of ended my interview.

18         While I was doing my paperwork, he knocked on

19   the door and he wanted to go to the bathroom.   I took

20   him to the bathroom.   After he finished doing whatever

21   he was doing, he was washing his hand, and he turns to

22   me and says, "I already spoke to Leslie.   I thought he

23   was dropping this."   And he said it to me, and he

24   said, "Look, I'm not a thug, I'm a rap star," or "I'm

25   a rapper," or something like that.

1      Q.   Okay.  Did he make any other statements to

2 you?

3      A.   When we were getting in the prisoner van, he

4 kept on saying that he was hanging out with Shug Night

5 (phonetic) and other rappers.  And he said that he was

6 a rapper now, and he wasn't in that kind of life.

7      Q.   Is that everything that he told you?

8      A.   To my memory, yes.

9        MR. ROTH:  Do you want to read or waive?

10        THE WITNESS:  Read.

11        MR. ROTH:  Thank you.  I appreciate your

12 time.

13        MR. CABRERA:  That's it.

14        (Thereupon, the taking of the deposition was

15 concluded.)

16        (Reading, signing, and notice of filing were

17 not waived.)

18

19

20

21

22

23

24

25

34

CERTIFICATE

STATE OF FLORIDA)

COUNTY OF DADE  )


        I, SOFIA CHEDIAK, Court Reporter Notary

Public in and for the State of Florida at Large, do

hereby certify that I reported the deposition of

DETECTIVE OCTAVIO TELLEZ, taken before me at the time

and place stated in the caption thereof.


        I further certify that said witness was duly

sworn according to law; that I am not of counsel to

any of the parties hereto, or otherwise interested in

said cause.


        IN WITNESS WHEREOF, I have hereunto set my

hand and affixed my official seal this 8th day of

November, 2002.



_____
SOFIA CHEDIAK
Court Reporter, Notary Public
My commission expires:  6/13/03

OFFICIAL NOTARY SEAL
SOFIA CHEDIAK
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC838965
MY COMMISSION EXP. JUNE 13,2003

A. J. REPORTING
(305) 386-4000

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO.: F-02-24455

STATE OF FLORIDA,

      Plaintiff,

vs.

JIMMY CASIMIR a/k/a
MCHARRY LAFONTANT,

      Defendant.

_____/

COPY

          State Attorney's Office
          1350 N.W. 12th Avenue
          Miami, FL 33136
          November 5, 2002
          3:10 p.m.

02 NOV 12 AM 2:13

## DEPOSITION OF DARREN JOLLY



GOVERNMENT
EXHIBIT
3
0:00cR06255-001

    Taken before **SOFIA CHEDIAK**, Court Reporter and

Notary Public, pursuant to Notice of Taking Deposition

filed in the above cause.

A. J. REPORTING SERVICES, INC.
(305) 386-4000

2

APPEARANCES:


On behalf of the Plaintiff:

     ROGER CABRERA, ASA
     1350 N.W. 12th Avenue
     Miami, Florida  33136


On behalf of the Defendant:

     Haber & Roth, P.A.
     BY:  MARTIN L. ROTH, ESQ.
     1001 Brickell Bay Drive, Suite 1704
     Miami, Florida  33131




I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| DARREN JOLLY | | | |
| (By Mr. Roth) | 3 | | 53 |
| (By Mr. Cabrera) | | 52 | |

```
 1   Thereupon,

 2                        DARREN JOLLY,

 3   was called as a witness by the Defendant and, having

 4   been first duly sworn, testified as follows:

 5                      DIRECT EXAMINATION

 6   BY MR. ROTH:

 7        Q.  Sir, would you state your name for the

 8   record, please.

 9        A.  Darren Jolly.

10        Q.  Is that your true name?

11        A.  Yes, sir.

12        Q.  And when I say "Is that your true name" --

13        A.  Birth.

14        Q.  -- that's the name on your birth certificate?

15        A.  Yes, sir.

16        Q.  Where were you born?

17        A.  Jacksonville, Florida.

18        Q.  You were born in Jacksonville, Florida?

19        A.  Yes, sir.

20        Q.  When were you born?

21        A.  1976.

22        Q.  Can you give me your complete date of birth?

23        A.  June 23rd, 1976.

24        Q.  And what is your mother's name?

25        A.  Nora.
```

4

```
1       Q.   What is it?

2       A.   Nora.

3       Q.   What is her last name?

4       A.   Jolly.  But she recently been married to

5   Reynolds, but she --

6       Q.   I'm not going to ask you a lot about your

7   mama.  I just want to know the name on the birth

8   certificate.

9            Is your father on your birth certificate?

10      A.   No -- well, he should be.  It's been so long

11  since I really looked at my birth certificate to see

12  if my dad is on it, but he should be.  He didn't

13  abandon me.

14      Q.   What is your father's name?

15      A.   Ronald Jolly.

16      Q.   Ronald what?

17      A.   Jolly.  He lives in England.

18      Q.   Okay.  And you say you were born in --

19      A.   Jacksonville.

20      Q.   -- Jacksonville Florida, right?

21      A.   Yeah.

22      Q.   Now, if I look into this carefully enough,

23  I'm not going to find that you were actually born

24  somewhere else, am I?

25      A.   (Witness shook his head).
```

5

1          MR. CABRERA:  You have got to answer out

2     loud.

3          THE WITNESS:  No, sir.

4     BY MR. ROTH:

5          Q.  Because I want to give you a good chance.

6     I'm not here to create problems for you, I'm here to

7     find out what happened, who you are, and to get to the

8     truth.  So, before I leave the deposition the way it

9     is, I want to tell you that it is actually a criminal

10    offense, a violation of Title 8 of the United States

11    Code, to make a false claim to U.S. citizenship.  So,

12    if you leave the record the way it is, that would be

13    your choice, but you're under oath and you're

14    testifying under penalty of perjury.

15         MR. CABRERA:  Martin, I think he understands

16    that.  Just go ahead and shoot away.

17    BY MR. ROTH:

18         Q.  If you were born in Jacksonville, Florida,

19    I'll leave your answer at that.  But if you weren't,

20    this would be your best opportunity --

21         A.  Like he said, you could get to the point.

22         Q.  Pardon me?

23         A.  Like he say, you could get to the point.

24    That's that.

25         Q.  Your testimony is you were born in

6

1    Jacksonville, Florida?

2        A.   That's that.

3        Q.   Yes?

4        A.   I'm quite sure I know where I was born.

5        Q.   And the name on your birth certificate is

6    Darren Jolly, and no other name?

7        A.   Yes, sir.

8        Q.   And when did you leave Jacksonville, Florida?

9        A.   Since I was a baby.

10       Q.   How long have you lived in Dade County?

11       A.   About 17, 18 years, 19 probably.  I've been

12   bouncing.  I've been in several different places.

13       Q.   How old are you?

14       A.   I'm 26.

15       Q.   And you have been in Miami as long as 19

16   years?

17       A.   Yeah, you could say that.

18       Q.   So, from the time you were born until you

19   were seven years old, where did you live?

20       A.   Like I said, I've been in all type of

21   different places.  Between the adults years, I've been

22   in Orlando, I've been in Fort Pierce, where I'm at

23   now, I've been out in Naples.  Other places I was too

24   young to know.

25       Q.   But from the time you were about seven years

```
 1    old, you have lived right here in Dade County,
 2    Florida?
 3         A.   Yeah.  From what I know, yeah.
 4         Q.   And you have never --
 5         A.   On and off.  I've been leaving.  But never
 6    really made resident (sic) in no other town but Dade
 7    County.
 8         'Q.  And you have never lived in a foreign
 9    country?
10         A.   No -- yeah, yeah, I lived in a foreign -- my
11    daddy -- my daddy is English.
12         Q.   You have lived in England?
13         A.   Yeah, I've been there.
14         Q.   When were you in England?
15         A.   I was about seven or eight.
16         Q.   Since then, since the time you were seven or
17    eight, have you lived in any foreign country?
18         A.   No.  I visit.  I regularly go to England to
19    visit my dad.
20         Q.   Other than England, have you ever been in any
21    other foreign country?
22         A.   I've been on a cruise to the Bahamas.
23         Q.   When you travel to England, do you travel on
24    a United States passport?
25         A.   Only on my birth certificate and a passport.
```

8

```
 1   That's it.

 2        Q.  You travel to England, you said, on a birth

 3   certificate and what else?

 4        A.  I think they gave me a temporary passport.

 5        Q.  When did you get a temporary passport?

 6        A.  I'm not quite sure, but the date should be on

 7   it.

 8        'Q.  For how many years have you had a temporary

 9   passport?

10        A.  When you use it, it is only for that period

11   of time.  Then it's no good.

12        Q.  Any time you go visit your father in England,

13   you obtain a temporary passport?

14        A.  Temporary passport.

15        Q.  Where do you get that from?

16        A.  Immigration Office.

17        Q.  On 79th Street?

18        A.  I'm not quite sure.  My mom always takes care

19   of it.  But that's where I went before, on 79th, right

20   there and Biscayne.

21        Q.  So, Darren, at least to my understanding, the

22   United States Immigration Service has no authority or

23   jurisdiction over passports.  That is the

24   responsibility of the United States Department of

25   State.
```

1          Are you sure you went to immigration to get a

2    passport?

3          A.  Like I said, my mom went and took care of

4    that.  I'm not quite sure.  I know we went to 79th

5    building at first.  We didn't get it actually from

6    them, but we went there first.

7          Q.  Where did you get it?

8          A.  I don't know.  She took care of it.

9          Q.  Have you ever gone personally to get a

10   passport?

11         A.  No.

12         Q.  Have you ever filled out an application --

13         A.  Since I turned really 18, I haven't really

14   been seeing or going there.  That's when I was a

15   child, when he used to send for me for vacation and

16   stuff like that.  Since I've been turning an adult, he

17   tell me if I want to come see him, I've got to pay for

18   the ticket.  A ticket to England is $750 for a plane

19   ticket, or some stuff like that.  So, therefore, I

20   can't afford it, so I haven't seen him in a long time.

21         Q.  So, since your 18th birthday, you haven't

22   traveled?

23         A.  No.

24         Q.  Have you ever been arrested?

25         A.  Yes.

1    Q.   How many times have you been arrested?

2    A.   Several.

3    Q.   Several, did you say?

4    A.   Yes.

5    Q.   When is the last time you were arrested?

6    A.   I was arrested last time, I think -- I'm not

7    quite sure, I'm not quite sure.  I wouldn't lie to

8    you. I don't want to lie.  It's most likely -- I

9    think the last time I was arrested was for

10    misdemeanor.

11    Q.   Have you ever been convicted of a felony?

12    A.   Yeah.

13    Q.   When have you been convicted of felonies?

14    A.   I have no idea when and the time period, but

15    I know I have a felony conviction.

16    Q.   What have you been convicted of?

17    A.   I'm not quite sure, but I know I've got an

18    aggravated assault for sure.

19    Q.   And when do you think that happened?

20    A.   Years ago.  About five or six years ago.

21    Q.   What happened on the case?

22    A.   I think I took a plea to probation or some

23    stuff.

24    Q.   And after that, have you gotten any other

25    felony convictions?

1    A.   I'm quite sure about one or two more after

2  that.   I'm not sure what they was about.   I think I

3  pled out about two or three times in my life.

4    Q.   Do you remember what for?

5    A.   No, sir.

6    Q.   So, you don't know if it was, for example, a

7  gun, or robbery, or --

8    A.   No, I ain't never had no robbery.   No

9  robbery, no gun, no nature of first-degree kind.   It

10 is always third degree, assault.   Mostly, third

11 degree.

12   Q.   Any drug charges?

13   A.   Possession.

14   Q.   Possession charges?

15   A.   Yeah.   I had one possession of, I think,

16 crack cocaine.

17   Q.   So, you told me you think you have an

18 aggravated assault conviction --

19   A.   I didn't say "I think."   I know I've got an

20 aggravated assault.

21   Q.   And possession of crack cocaine conviction?

22   A.   Yes.

23   Q.   Anything else?

24   A.   The crack possession, I'm not sure if it's a

25 conviction.   I know I've been arrested before for

1    crack.  I'm not sure if it was a conviction.  I think

2    I beat it.

3        Q.  So, you told me you have an aggravated

4    assault conviction five or six years ago that you got

5    probation for.  Since then, you think you have one or

6    maybe two more felony convictions.

7        A.  Yeah.

8        Q.  Do you know what those convictions are for?

9        A.  Like I tell you, marijuana.  It could be

10   mostly driving without license.

11       Q.  That's a misdemeanor, right?

12       A.  Yeah.

13       Q.  Do you use any other names, other than Darren

14   Jolly?

15       A.  David Jackson.

16       Q.  Why do you use the name David Jackson?

17       A.  If you look at a record, I was 17 when I

18   first got arrested on the David Jackson, and I didn't

19   want my mama to whoop me, so I tried to go to jail and

20   get out the next day before she knew.

21       Q.  So, the first time you were arrested, you

22   said your name was David Jackson?

23       A.  I lied.  I said I was David Jackson so I

24   could get out without my mama knowing.

25       Q.  Other times that you were arrested, did you

1    use your true name?

2        A.   Yeah.

3        Q.   Darren Jolly?

4        A.   Yes.

5        Q.   The only names you have been arrested under

6    is Darren Jolly and David Jackson?

7        A.   And Darren Kerr.   Sometimes the arresting

8    officer give you whatever name they choose to give you

9    sometimes.   That happened to me twice.   Me acting

10   stupid, they were, "Okay that's your name there."

11       I've been in the hotel before, and they came

12   and they said, "Oh, you're the one that checked in, so

13   that's your name."   I've been in that type of

14   situation.   In some cases, I beat it, so they never

15   really stick.   That was under the name Darren Kerr,

16   K-e-r-r.

17       That's about it.

18       Q.   But you say that's not a name that you used,

19   that's just a police --

20       A.   No, it was a name I was given.   I was charged

21   under the name because of the fact that I was there in

22   the hotel, and the man said that's me registered in

23   the room.

24       Q.   Did you use the name David Kerr at one point?

25       A.   Darren Kerr.

```
 1        Q.   Darren Kerr?

 2        A.   Yeah.

 3        Q.   You have used what you have told me was your

 4   true name, Darren Jolly --

 5        A.   Yes.

 6        Q.   -- David Jackson and Darren Kerr?

 7        A.   Yes, sir.

 8        Q.   Any other names?

 9        A.   No, sir.

10        Q.   Those are the only three names you have ever

11   used?

12        A.   Yes, sir.

13        Q.   Do you have a social security number?

14        A.   Yeah.  Everybody got a social security

15   number.

16        Q.   What's your social security number?

17        A.   I don't have it with me right now.

18        Q.   When you went to the State Attorneys Office

19   and you swore on an affidavit for use at the Arthur

20   hearing on September 12, 2002, did you tell the notary

21   public at the State Attorneys Office that your social

22   security number was 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?

23        A.   At the time, I had a paper I wrote it down

24   on.  I don't really know, sir.  My wife had wrote it

25   down for me.  There is no way of really knowing what
```

15

1    it was.  I had a paper where I had it written.

2         Q.  So, if the notary public at the State

3    Attorneys Office took that down as your social

4    security number, is that because that's what you told

5    her?

6         A.  Yes, sir.

7         Q.  And you believe that to be your social

8    security number?

9         A.  Yes, sir.

10        Q.  And do you have a social security card?

11        A.  Yes, sir.

12        Q.  And did you have that with you at the State

13   Attorneys Office?

14        A.  At that time?

15        Q.  Yes.

16        A.  No.  Because during the incident, I left all

17   of my stuff -- I lost all of my stuff -- ID,

18   everything.

19        Q.  During what incident?

20        A.  The incident that happened -- a different

21   thing from this.  I lost all of my identification.  I

22   was supposed to get it back, and I never did.

23        Q.  So, when you were at the State Attorneys

24   Office and you signed that affidavit for the Arthur

25   hearing, you had no identification with you?

```
1        A.   Yes.  Under my identification.

2        Q.   What did you have?

3        A.   My ID.

4        Q.   What kind of ID did you have?

5        A.   State ID.

6        Q.   So, you had a state identification card?

7        A.   Yes.

8        Q.   With your photograph on it and your name?

9        A.   Yeah.

10       Q.   And did you show that to the notary that

11  notarized your Arthur hearing affidavit?

12       A.   I don't know with a notary or -- I don't know

13  who was that person specifically you were talking

14  about.

15       Q.   Did you sign your name in front of someone

16  who first went over your other hearing affidavit with

17  you and asked you to raise your right hand and swear

18  that what was written on there was true and correct?

19       A.   Yeah.

20       Q.   And you did swear to it, right?

21       A.   Yeah.

22       Q.   And then you signed it?

23       A.   Yeah.

24       Q.   And then that person, you gave her your

25  social security number?
```

1      A.   Yeah.

2      Q.   A lady?

3      A.   Was it a lady?  I'm not quite sure whether it

4  was a lady or man, but it was somebody in the office.

5      Q.   And then as far as you know, they signed as a

6  notary public on your Arthur hearing affidavit?

7      A.   As far as I know, I think so.

8      Q.   And you say that you had some type of a photo

9  ID with you on that day, on September 12th of 2002.

10     A.   Yeah.

11     Q.   And you didn't show it to the notary?

12     A.   Huh?

13     Q.   You did not show it to the notary?

14     A.   I can't remember what I did.

15     Q.   But you do remember telling them your social

16  security number?

17     A.   Yeah, I remember I had that written down.

18     Q.   And you read it to them off a piece of paper?

19     A.   Yeah.

20     Q.   So, when I ran your social security number

21  that you gave the notary public for the State

22  Attorneys Office, it came out to somebody named

23  Ruben J. Magana (phonetic), who lives in Downieville

24  California.

25     A.   I don't know that.

18

1    Q.   I mean, how did you get that social security

2    number?

3    A.   I told my girl to write it down from some

4    previous paper I had.

5    Q.   What kind of paper did you have?

6    A.   I don't know what kind of paper she wrote it

7    down from.   I asked her if there is any paper from

8    there with my social security number, and she wrote it

9    down.

10    Q.   Do you have actually a card issued to you

11    from the social security office?

12    A.   Yeah, I had one.

13    Q.   Where is that?

14    A.   That's where I say it got missing.

15    Q.   It got missing?

16    A.   It was in a car I had that got stolen, and

17    some stuff I had got missing out of it.

18    Q.   When was that?

19    A.   A while ago.

20    Q.   Was that before you went to the State

21    Attorneys Office to sign your affidavit?

22    A.   No.

23    Q.   It was afterward?

24    A.   Yes.

25    Q.   So, at the time you gave that typed up

19

1    statement that you read and you swore it was true and

2    you signed it, you had your identification on that

3    day?

4        A.  Yeah, I had it.  I just didn't have it on me,

5    the green -- the social -- I didn't have it with

6    myself.  I didn't know I needed all that to give a

7    statement.  So, I had to call my girl.  She told me

8    she's going to write it down for me on a piece of

9    paper.

10       Q.  But you did have a state issued

11   identification card?

12       A.  Yeah.

13       Q.  And it was issued to you prior to

14   September 12, 2002?

15       A.  No.  I've been having it before that.

16       Q.  So, even before you went to the State

17   Attorneys Office, you had it?  Even before this

18   shooting incident that happened on July 27, you had

19   it?

20       A.  Yeah.

21       Q.  Do you have a valid driver's license?

22       A.  No.

23       Q.  When is the last time you had a valid

24   driver's license?

25       A.  Did I say I got one?  I didn't have one.

20

```
 1       Q.   When is the last time?

 2       A.   I never had one.

 3       Q.   You have never had a driver's license?

 4       A.   No.

 5       Q.   Did you ever drive under the name Kevin

 6  Jackson?

 7       A.   Kevin Jackson?

 8       Q.   Yes.

 9       A.   Kevin Jolly probably, not Kevin Jackson.

10       Q.   So, would it be your testimony that you have

11  never used the name Kevin Jackson for driving

12  purposes?

13       A.   Kevin?  Like I said, there is no telling what

14  the police -- some police put anything or any name on

15  there.  If you want, I'll go pull out a copy of my

16  record, if that's what you need.  You want a copy of

17  my record or something?  Because that's not an issue,

18  is it?

19            MR. CABRERA:  Darren, just listen to his

20  questions and just answer.  He's got to go through

21  this.  He has got to ask these questions.  I know they

22  have nothing to do with the facts of the case.

23            THE WITNESS:  That's what I'm saying.

24            MR. CABRERA:  He's doing his job.  Just

25  answer the questions the best you can.
```

```
 1              MR. ROTH:  I'll move right on.  I just want

 2    to get this clear.

 3    BY MR. ROTH:

 4         Q.  Would it be your testimony that you have

 5    never driven under the name Kevin Jackson?

 6         A.  Yeah, I drove under the name.

 7         Q.  And when you drove under the name of Kevin

 8    Jackson, you have told the police that your date of

 9    birth was June 23, 1976 instead of June 23, 1977?

10         A.  I told them June 23, 1976.

11         Q.  You lied to the police when you told them

12    that?

13         A.  What did they say I told them, '77?

14         Q.  '76?

15         A.  What I told you is '76, right?

16         Q.  You told me '77, didn't you?

17              MR. CABRERA:  No, he told you '76.

18              THE WITNESS:  I don't know what you're

19    listening to, bro.

20              MR. CABRERA:  Let me make a phone call.

21              THE WITNESS:  I told you '76.

22    BY MR. ROTH:

23         Q.  Did you ever tell the police that your name

24    was Darren Jolly and that your date of birth was

25    June 23, 1977?
```

24

1       A.   Jolly.

2       Q.   Darren Jolly or Darren Gordon?

3       A.   Darren Jolly.

4       Q.   So, if I look at your school records, am I

5    going to find you registered for school as Darren

6    Jolly or Darren Gordon?

7       A.   Darren Jolly.

8       Q.   Where did you go to school?

9       A.   Basically, McArthur -- not McArthur -- Jam

10   Man Middle School.  It is an alternative program.

11      Q.   Where did you start middle school before?

12      A.   Jam Man.

13      Q.   That was the first middle school you went to?

14      A.   Yes, sir.

15      Q.   Do you have a friend by the name of Mecka

16   Menys?

17      A.   Yeah, I associate, yeah.

18      Q.   You wouldn't call her a friend?

19      A.   No.

20      Q.   Okay.

21      A.   More like a wife.

22      Q.   She's your wife?

23      A.   (Witness nods head).

24      Q.   You live together with her?

25      A.   Yes, sir.

1    Q.   And do you know what her real name is?

2    A.   That's her name.

3    Q.   Mecka Menys?

4    A.   Yes, sir.

5    Q.   Do you know how to spell her name?

6    A.   It should be a question you could ask her.

7    Q.   As far as you know, that's her name, Mecka

8    Menys?

9    A.   Yes, sir.

10   Q.   And the two of you reside together?

11   A.   Yeah, we stay in the house together.  We hide

12   in the ghetto.

13        MR. CABRERA:  Don't tell him where you live.

14   BY MR. ROTH:

15   Q.   And how long have you known Mecka Menys?

16   A.   A year.

17   Q.   I'm sorry?

18   A.   A year.

19   Q.   A year?

20   A.   Yes, sir.

21   Q.   I want to ask you now about what occurred and

22   what happened to you during the morning hours of July

23   27, 2002.

24   A.   July the 27th?

25   Q.   Yes.

26

```
 1        A.   That's the day of the incident?

 2        Q.   That's my understanding.  But I'll tell you

 3   what, I'll look at the police report.

 4             Yes, based upon everything that I understand

 5   about this case, you were involved in an incident that

 6   involved a shooting during the early morning hours of

 7   July 27, 2002.

 8             Did you have something unusual like that

 9   happen to you?  Were you the victim of a shooting?

10        A.   Yeah.

11        Q.   Okay.

12        A.   That's July?  It's been that long since that

13   happened?

14        Q.   Well, I wouldn't misadvise you.  I mean, I

15   wasn't there, but I've read all of the reports in the

16   case, and that's what the reports tell me.

17        A.   Okay.

18        Q.   So, I guess what I want you to do is I want

19   you to start out for me, if you would, and tell me,

20   starting at midnight, July 27, 2002, where you were

21   and sort of take me through your morning.

22        A.   The night 'til the morning?

23        Q.   Yes.

24        A.   About 12:00, I was home sleeping, waiting on

25   my wife.  She was at work.  She worked at the strip
```

1    club.

2        Q.   That's Mecka Menys?

3        A.   That's Mecka Menys.

4        Q.   What club does she work at?

5        A.   Take One Lounge.

6        Q.   Where is that?

7        A.   79th Street and N.E. 3rd Avenue.

8        Q.   So, you were sleeping and your wife was

9    working, right?

10       A.   Yeah, I was sleeping and my wife is working.

11   I run the car wash in the daytime and she work -- we

12   own a car wash together.

13       Q.   Okay.

14       A.   I was basically sleeping.  I know she get off

15   at 5:00 in the morning.  So, Leslie stay across the

16   street.  I have a license problem, as you see my

17   record, so I said, "Les, could you take me to go to

18   pick up my girl, because I don't want to drive."

19           "Okay, no problem."

20       Q.   About what time is it that you do that?

21       A.   It was about 4:00.  So, about 4:15, we got

22   ready, everything.  He said "All right, you ready?

23   Let's go."  He went, "Man, you know the dudes that I

24   had a little problem with, they might be at the club.

25   That's the regular hanging spot for them."

28

1             "I don't have no problem with them.  You're

2    in my car."

3             He said, "No problem."  He said, "Don't take

4    your car."

5             So, I went and I borrowed some dude's car who

6    live on Hallandale, a good friend of mine car.

7        Q.   Who is that?

8        A.   What is the name?  I don't really know his

9    name exact, but we call him Rags.  That's what they

10   call him.  The car is basically in his name.

11            So, anyway --

12       Q.   What kind of car is it?

13       A.   A red Barreta Chevy.

14            So, he gave us the car, and we went on our

15   way.

16       Q.   Could you tell me anything about this friend

17   of yours whose car you borrowed?

18       A.   No.

19       Q.   Give me like a physical description.  What

20   does he look like?

21       A.   Just a regular white dude, pretty nice.  He

22   come to my car wash every week.  Stuff like that.  A

23   good dude.

24       Q.   And you borrowed his car?

25       A.   Yeah.  He know my wife very well, too.

29

1      Q.   So, what do you do, you call him up?

2      A.   Huh?

3      Q.   You call him up?

4      A.   He stayed a few blocks from me.  I was

5   staying on 3rd Street, and he's staying on Hallandale.

6   That's three blocks to Hallandale.

7      Q.   He's up that early in the morning?

8      A.   Who, the dude?

9      Q.   Yes.

10      A.   Yeah.  He smoke crack, bottom line.  I don't

11   got to hide nothing.  He smoke crack.  I rented a car

12   to go and pick up my wife for ten bucks or whatever,

13   and he lend me the car.  So, me and Les basically went

14   down to Take One in this guy car, because we didn't

15   want to use a car that everybody know.  You see, he

16   already have problems with them guys, and he didn't

17   want me riding in the car.  So, I respect the fact --

18   I went, and I pulled up in 79 -- I come on 79th, and I

19   make a left on 79th to put it in the parking lot.

20   When I pulled in the parking lot, it was at least -- I

21   would say about 4:45.

22          Les said, "We're going to pull up and wait on

23   your girl.  I don't want to go in the club."

24          I said, "I don't go in there either,

25   especially when she working."

30

1       He said, "All right, we are going to park

2   right here to the side of the club and wait on her."

3       So, on the way driving toward where we were

4   going to park to the parking lot, we saw a white

5   utility truck in the parking lot.  So, I told Les,

6   "There is four dudes in that truck going slow as we

7   pull up.  I said, "Don't worry about it."  So, boom,

8   we pulled up, and as I stopped the car, these two guys

9   start shooting out of the white truck.  They just

10  start shooting.  I didn't even know what or who at

11  that point.

12      Q.  This is right in the parking lot of the Take

13  One Lounge?

14      A.  Right in the parking lot in the back.

15      So, boom, the same time, I tell him, "Punch

16  it."  We punched it.  We went around the corner and

17  the tire was flat.

18      Q.  You fire back at the car?

19      A.  No.

20      Q.  You carry a .9 millimeter with you?

21      A.  No.

22      Q.  You don't have a Taurus .9 millimeter?

23      A.  No.  I ain't never bought a gun -- purchased

24  a gun, nothing.

25      So, at this time when it happened, we said,

```
 1    let's punch it back to 95th Street -- I mean, we

 2    didn't say that, we said, "Let's punch it to somewhere

 3    safe where we can get out of the car and try to make a

 4    call to somebody to get us."

 5          So, I made it on the flat tire all the way

 6    from 79th to 95th Street and N.W. 6th Avenue, right

 7    off to the 95.  And at the same time, my girl is

 8    calling me asking me where I'm at.

 9          I said, "I was there about ten or fifteen

10    minutes ago, and there was a whole bunch of chaos in

11    the parking lot.  Somebody tried to kill me.  I don't

12    know what happened."

13          She's like, "Where you at now?  Are you

14    okay?"

15          I said, "I'm okay.  I'm on 95."

16          She said, "I'm going to come pick you up."

17          I said, "Come on."

18          She came there.  She arrived about five

19    minutes later.  So, we tried to fix the tire.  The

20    jack wouldn't lift the car on the way up.  So, me and

21    Les decide we are going to lift the car up and

22    Michelle is going to slide the tire on for us.

23       Q.   Okay.

24       A.   While we're doing that -- I don't know what

25    happened after that, but I see the truck -- the
```

32

1    Explorer hit the corner again, the windows started

2    falling out, and McHarry came out to the front window

3    and Frank in the back, and he started coming shooting

4    again.  So then I took off toward across 95, and

5    Michelle --

6        Q.  You say you took off.

7            You're on foot, right?

8        A.  Yeah, yeah.

9            Michelle stood behind the car where she was

10   fixing the tire, and I told Mecka, "Come on, come on,

11   let's run, let's run."

12           And we ran toward southbound of 95 and went

13   in somebody yard, and Leslie ran toward northbound,

14   but what it was -- the jeep was going toward

15   northbound on 95, so the shots was going straight

16   towards his direction.  There is no way he could

17   escape.  So, when he got hit, what saved him is he

18   fell behind a garbage can.  They didn't know he really

19   got hit.  So that's why they went to his house early

20   in the morning looking for him.  They didn't know he

21   got hit or nothing.

22           That's when the girl, Michelle, came with the

23   Explorer, picked us up, me and my girl.  I asked this

24   dude in the parking lot -- he saw everything on the

25   bike.  He said, "Your friend is in the corner.  He got

33

1    shot."  I went around the corner where he was at and

2    he was shot, and he said he couldn't feel his body or

3    nothing.  I'm like, "Man, I ain't going to leave you

4    here.  I'm going to bring you up and bring you to

5    Parkway."  Because Parkway ain't more than four blocks

6    away.  I put him in the jeep and everything, and -- I

7    put him in the jeep and went around the block.

8        ·    By the time --

9        Q.    When you say "the jeep," what are you

10   referring to?

11       A.    Michelle's truck.

12       Q.    It is not a jeep, is it?

13       A.    A Ford Explorer, too.

14       Q.    Oh, okay.

15       A.    We put Les in the truck, and I went around

16   4 Court to come around and make a U to go back toward

17   west.  When we hit by the light on 6th Avenue and 95,

18   the police roped us off and took Les out of the car

19   and said we can't take him to the hospital, they'll do

20   all that.

21            And that's when detectives and everybody

22   came, and things went real crazy.  They started asking

23   all type of questions and everything.  I didn't really

24   felt like at that time answering any questions.  I

25   just wanted to know if my friend was going to live.

34

1    Forget all of that.

2         Q.  Why didn't you want to answer any questions?

3         A.  Because I wanted to know about the important

4    thing.  What they were asking wasn't really important

5    in my life right now who did what.  What was important

6    was the guy dying in front of me.  So, therefore,

7    after about two days, three days later, I went to --

8         MR. CABRERA:  One second.

9         (Thereupon, there was a brief off-the-record

10   discussion, after which the following proceedings were

11   had)

12   BY MR. ROTH:

13        Q.  That night, did you tell the police you

14   didn't know who did the shooting?

15        A.  I said, "I don't know what you're talking

16   about right now."  I didn't say I don't know who did

17   it.  I said, "I don't know what you're talking about

18   right now."

19        Q.  Well, the police wanted to know who the

20   shooters were that night, right, so they could do

21   their job?

22        A.  I guess.

23        Q.  And you didn't tell them, did you?

24        A.  I didn't tell them I didn't know who did it.

25   I said, "I don't got to talk right now."  I told them

1  my friend is in critical condition, whatever.  That's

2  the only thing I wanted to worry about right now.

3       Q.  You didn't want to tell them who did the

4  shooting?

5       A.  No, I didn't want to talk at that moment

6  right there.

7       Q.  Did you tell the detective later that you

8  were going to take care of the problem yourself?

9       A.  No.

10       Q.  You didn't tell Detective Tellez that you

11  were going to deal with the problem your own way?

12       A.  No.  That's my own way right here.  I'm

13  dealing with it now.

14       Q.  But the detective would be wrong then if he

15  says that you told him that you were going to take

16  care of the problem your own way?

17       A.  Uh-huh.

18       Q.  So, how many days later did you tell the

19  police who you thought the shooters were?

20       A.  Well, I'm not quite sure.  It's when Leslie

21  called me begging me, "Oh, man, they riding around by

22  my mama house, and they threatening my mama."

23       Q.  Your mother?

24       A.  No, Leslie mama.  Because she gave a police

25  report.  I've got a copy in my house, that the guys

36

1    came to her house with guns and stuff.  And her nephew

2    saw the guy.  The nephew know McHarry too, and they

3    hiding him -- the little nephew -- they are hiding

4    him.

5        Q.  Who are you talking about?

6        A.  Leslie little nephew -- either one saw them

7    jumping or walking around the house with the guns.

8    But either one who made the statement -- suddenly, he

9    can't be found.

10        Because Les' people -- he been paid off,

11    Leslie.  Right now he probably come in here and talk a

12    bunch of bullshit, you know.  And this is something I

13    know and I've got on tape.

14        Q.  What do you have on tape?

15        A.  Les being paid off.

16        Q.  Where is the tape?

17        A.  I forgot to tell you that.  I've got a

18    recording.

19        Q.  What do you have on a recording?

20        A.  He got money from them not to come to court.

21    I've got all that.

22        Q.  Did you tape Leslie?

23        A.  Yeah.  Saying he got his money.

24        Q.  How did you tape him?

25        A.  Just something I did, I thought about.

37

1    Something I think about.  I set it up, I did it.  I

2    just have my backup.

3            I have my lawyer right here that could say if

4    there is no problem, right?

5            MR. CABRERA:  Just listen to his question and

6    answer it.  Just be honest.

7    BY MR. ROTH:

8        Q.  Where is the tape right now?

9        A.  Nowhere where it could be found right now.

10   Just my safety.

11       Q.  I'm sorry?

12       A.  It is just for my precaution.

13       Q.  So, you have a tape of a conversation between

14   you and Leslie?

15       A.  Yeah.  That he's being paid off.

16       Q.  And does Leslie speak on the tape?

17       A.  Yeah.

18       Q.  Does he know he's being recorded?

19       A.  Yeah.

20       Q.  You told him, "I'm recording this

21   conversation"?

22       A.  Yeah.  Every time he called me and talk to

23   me, I tell him straight up.

24       Q.  That you're recording?

25       A.  "I'm recording your conversation."  Every

```
 1    time he called me, I tell him, "Whatever you say, man,
 2    my lawyer know."
 3              Because I don't trust him either.
 4         Q.  Do you tell him that you're recording the
 5    conversation?
 6         A.  Yeah, for sure.  I know by law you have got
 7    to make somebody know you're recording.  It's buffeley
 8    (phonetic).
 9         Q.  It's what?
10         A.  It's buffeley.  It's no good.
11              By law, it's legal.  I know the law very
12    well.
13         Q.  So, how many times have you recorded Leslie?
14         A.  Just once, just once.
15         Q.  Have you listened to the tape recently?
16         A.  Who me?
17         Q.  Yes.
18         A.  No.  I just gave it to my wife, in case
19    anything, to give it to my lawyer.
20         Q.  In case anything, to give it to your lawyer?
21         A.  Yeah.
22         Q.  Do you plan on giving the tape to your
23    lawyer?
24         A.  If it's necessary.
25         Q.  What would deem it necessary?
```

39

1      A.   We've got to give it if we see we ain't going

2  to win the case.   We're gonna win the case, because I

3  done no less on the defense.

4      Q.   So, had you told the State Attorneys Office

5  prior to today that you had made a tape recording?

6      A.   No.   This is new to everybody.

7      Q.   Everybody is finding out just now?

8      A.   Yes.

9      Q.   If you are requested to turn the tape over to

10  the State Attorneys Office, would you do that?

11      A.   I don't know.   We talked about it before, but

12  it wasn't about getting Les on tape.   It was the best

13  I could have did.

14      Q   Okay.   Now that everyone finally knows, the

15  defense and the state, that you have a tape-recorded

16  statement from Leslie --

17      A.   That he's being paid.

18      Q.   -- would you agree to turn it over to the

19  State Attorneys Office?

20      A.   Not until my lawyer asks for it.   If the

21  State asks for it.

22      Q.   Who is your lawyer?

23      A.   Well, Cabrera is my state attorney.

24      Q.   In other words, if Mr. Cabrera requests the

25  tape from you, you would turn it over to him?

1    A.    Immediately.

2    Q.    But you don't have it here with you today?

3    A.    No, sir.

4    Q.    Okay.  What did Leslie tell you on the tape?

5    A.    I'm not quite sure, but it's that he got a

6    little money from them to keep it cool, because they

7    are going to pay for several things.

8          They even called me and offered me some

9    money, and I tell them, "Just go ahead and buy Les.

10   Give Les a few thousand or whatever, because I don't

11   need it."

12         And he called to say he got it.

13   Q.    Did you record anybody offering you money?

14   A.    No.

15   Q.    Who offered you money?

16   A.    Frank.

17   Q.    Who?

18   A.    Frankie.

19   Q.    Did anybody threaten you?

20   A.    Threaten me?  Not lately.

21   Q.    Ever?

22   A.    Before he was in jail, yeah.  McHarry, he

23   used to call me every day threatening me.

24   Q.    For what?

25   A.    For what?  What do you mean for what?  That's

1   a menace.

2       Q.  Huh?

3       A.  That's just a menace.

4       Q.  He is a menace?  For what reason would he

5   threaten you?

6       A.  With Leslie.  The problem is Leslie.  I don't

7   have no problem with you guys.  I'm a promoter.  I go

8   out every day, give out fliers all day for these guys.

9       Q.  For their music group?

10      A.  Yeah, for their music group.  I do the

11  T-shirts, I do shows.  All this I do is out of my

12  pocket.  They don't pay me for this.  I've got to do

13  it and hope they get a deal and I get my money back in

14  the future.  So, therefore, it is not like I've got

15  some guys I hate, it is some guys I love to be doing

16  all this for.  But I know when they say some shit

17  about killing somebody, they'll kill them.  I'm not on

18  revenge or out to get these guys or nothing like that,

19  no.  I'm there just trying to protect myself,

20  basically.

21      Q.  But the night this happened, you weren't

22  concerned enough about protecting yourself to tell the

23  police who it is did the shooting?

24      A.  Well, at that moment right there, I knew I

25  wasn't in a great deal of trouble because the police

1    was around me and everything, and I knew I was going

2    to get in my car and drive all the way where I stay to

3    my brother house the same day I did, and the next two

4    days we look for a place out there, and I'm still out

5    there now, and I ain't coming back.

6        Q.   You didn't think it was important that night

7    to tell the police who the shooters were?

8        A.   No.   Because at the same time, I ain't going

9    to lie.   I ain't know what to do at that moment.   I

10   was in shock when I seen my friend and everything

11   going so fast.   But when I really look into it and Les

12   start talking to me and showing me the seriousness of

13   the problem, and they going to his house -- he's the

14   one who really told me to come to the state first and

15   to go ahead and tell what we saw and what is going on.

16   That's what I did.   I came and did what he told me to

17   do.

18       Q.   How many days after he had been shot did he

19   tell you that he no longer wanted to make a case out

20   of this?

21       A.   How many?

22       Q.   Yes.   How many days later?

23       A.   Basically, about a week after they got

24   McHarry.   Couple of days or week after they got

25   McHarry.

1      Q.   Is that when he told you that he didn't w

2  to make a case out of it?

3      A.   That he didn't want any more case out of it.

4      Q.   Okay.  Have you spoken to Jimmy Casimir or

5  McHarry Lafontant -- they are the same person -- have

6  you spoken to him since the shooting occurred?

7      A.   McHarry?

8      Q.   Yes.

9      A.   No.

10     Q.   What about Frankie?

11     A.   No, no -- I did, I did.  I did speak to him

12 after the shooting, when Les was in the hospital.  The

13 night after Less got shot, he calls and he like,

14 "Where you at, pussey?  Come out and play.  Your boy

15 fucked up.  You can't come out and play no more, huh?"

16 Blah-blah-blah and hanged up.

17     Q.   And what phone did he call you out of?

18     A.   A restricted number.

19     Q.   Your cell phone?

20     A.   Yeah.

21     Q.   Do you still use that same number?

22     A.   Basically, I think I do, yeah.  It's the same

23 number.

24     Q.   Okay.  And when you received that call from

25 McHarry Lafontant, do you remember the time of day?

1        A.    When did the incident happen?

2        Q.    July 27, at about 5:30 in the morning,

3   roughly that time.

4        A.    Say it had to have been like July the 30th at

5   least, 3:00 a.m. in the morning.   It was real early in

6   the morning.

7              And then they called me again when I was at

8   the detective office, Tellez.   I was in his office

9   when they called to threaten me, and I put him on the

10  phone saying, "Here, you're a witness that Frankie

11  called me that day, too."  But he did it in a slick

12  way.  I'm lying.  I couldn't say it is a threat.  It

13  is just intimidation type of shit, you know.

14       Q.    You're talking about Frankie calling?

15       A.    Yeah.

16       Q.    What did Frankie say to you?

17       A.    "Where you at now?"

18       Q.    So, Darren, are you aware that a .9

19  millimeter handgun was taken out of a Ford Explorer

20  vehicle of Michelle Haynes?

21       A.    Yeah, I was aware of that.

22       Q.    Did anybody ask you if that belonged to you?

23       A.    No, they didn't ask nobody about it.

24       Q.    When you were at the crime scene, did

25  somebody from the police department come and swab your

1  hands, and rub a cloth or cloth material on your

2  hands?

3      A.  No, that would have been a process to do,

4  but, no, it didn't happen.

5      Q.  So, your hands were never checked for

6  gunpowder or anything?

7      A.  No, they were never swabbed.

8      Q.  Did you see anybody ever have their hands

9  swabbed, checked for gunpowder, rubbed with a cloth?

10      A.  No.  Basically, he had us all separated.  He

11  had us all separated.

12      Q.  If that happened to somebody else, you never

13  seen it?

14      A.  I was alone, and Mecka was alone and Michelle

15  and Les were in the ambulance.

16      Q.  Your hands were never checked for hand

17  powder, as far as you recall?

18      A.  No.

19      Q.  Did you know .9 millimeter casings were found

20  at the Amoco station?

21      A.  They were shooting at me with a .9 millimeter

22  and a .40 (sic), they say.

23      Q.  You think the shooters were firing a .9

24  millimeter?

25      A.  No, the police officer told me they were

1   shooting a .40 millimeter and a .9 millimeter, or

2   something like that.

3        Q.  Well, so far as the .9 millimeter shell

4   casings, do you have any knowledge of where they came

5   from?

6        A.  Out of the Explorer, I guess.  Because they

7   were shooting two guns.  It was two guns.  Actually, I

8   heard it was three now.

9        Q.  Has anyone told you what shell casings were

10  found at the scene?

11       A.  They told me, yeah.  The detective told me

12  that.

13       Q.  What did he tell you?

14       A.  A .40 and a .9 millimeter.

15       Q.  So, why do you say three guns?

16       A.  Because today they were telling me that there

17  were three guns.

18       Q.  Who told you that?

19       A.  The detective.

20       Q.  Did he tell you what type of guns?

21       A.  Basically, no.

22       Q.  Do you know whose .9 millimeter gun was taken

23  out of Michelle's car?

24       A.  No.

25       Q.  You had never seen it before?

47

1      A.   No.   I ain't even get to see it.   So, I won't

2   know what it looked like.

3      Q.   As far as your understanding, is it against

4   the law for you to own a firearm, possess a firearm?

5      A.   Yeah.

6      Q.   Why is that?

7      A.   Because I'm a convicted felon.

8      Q.   You know you're prohibited from possessing a

9   firearm?

10      A.   Yeah.

11      Q.   Okay.

12      Q.   Do you still have that temporary passport

13   that you were issued?

14      A.   I'm sure my mom probably got it somewhere.

15      Q.   And did I understand correctly it was about

16   eight years ago that you last traveled to England?

17      A.   I'm 26 now.   Yeah.   I was 17.

18      Q.   When shots were fired, were any shots fired

19   toward you?

20      A.   Yeah.   They were firing everywhere.   You

21   can't really see a bullet coming, but basically, yeah.

22      Q.   After you started running, did you feel like

23   any shots were coming toward you while you were

24   running?

25      A.   Yeah.   I was in fear of my life.   If it

1    wasn't coming toward me, I wouldn't be in fear of my

2    life.  I wouldn't be here today.

3        Q.   The Ford Explorer the shots were being fired

4    from, did it come to a stop?

5        A.   No.  Slow roll.

6        Q.   How fast do you think it was going?

7        A.   I couldn't tell that.

8        Q.   Was it on the street or the avenue?

9        A.   It is on the ramp -- toward that ramp when

10   you're going to 95, right there.

11       Q.   It was on the ramp to get on 95?

12       A.   Yeah, when you get to 95, yeah.

13       Q.   That would be to get on --

14       A.   95th Street.

15       Q.   Southbound?

16       A.   Northbound.

17       Q.   So, if one of the witnesses said that she saw

18   you put that .9 millimeter handgun inside the Ford

19   Explorer, would that witness be wrong?

20       A.   Yeah.

21       Q.   That '92 Chevy Barreta that you were driving,

22   which you said you borrowed from somebody in

23   Hallandale, was that car shot up before you got to the

24   Amoco gas station?

25       A.   Yeah.

49

1      Q.  And bullets struck it at the Take One Lounge

2  parking lot?

3      A.  Yeah.

4      Q.  Did any glass break?

5      A.  Yeah.

6      Q.  In the parking lot?

7      A.  In the parking lot, yeah, my glass broke.

8      Q.  Your eyeglasses?

9      A.  No.  My glass.  The two back windows.  They

10  didn't really fell out because they got tints.

11     Q.  Which held the glass up so it didn't shatter?

12     A.  Yeah.

13     Q.  Since the conversation you had with Leslie

14  that you said you tape recorded where you claim he

15  told you that he had been paid, have you had any

16  further conversations with Leslie?

17     A.  Yeah.  I called him to let him know I'm

18  coming down here today.

19     Q.  You called him and told him that?

20     A.  Yeah, I told him.

21     Q.  Did he tell you anything?

22     A.  Not to do it.

23     Q.  And what did you say to him?

24     A.  I said, "You can't protect my mama or my

25  sisters.  If anything happens, what are you going to

1   tell me, I'm sorry?"

2       Q.   Your mother and your sisters, have they been

3   threatened in any way?

4       A.   Yeah.

5       Q.   They have been?

6       A.   Yeah.  He called me and told me how my mama

7   is dressed and all type of shit that she had on that

8   day, yeah.

9       Q.   Has anyone come to your house and bothered

10  your mother and your sister?

11      A.   No, ain't nobody been in my house.

12      Q.   And they still stay in their family house?

13      A.   My mama?

14      Q.   Yes.

15      A.   Yeah, yeah.  Basically, she stay there.  I

16  try not to let her about the problem.  She don't even

17  basically know what is going on, because she would be

18  flying out somewhere far, like me, too.  And I don't

19  want her to leave her business or anything.

20      Q.   You're not afraid for their safety, are you?

21      A.   My mom safety?

22      Q.   Your mama and your sister.

23      A.   Once Mike is in jail, I don't care.  I don't

24  think nobody else around is really that bold.  He just

25  a bold cat.  You know, he got to have that rap fame

51

1    and that name, and he's got to live up to his

2    reputation.  So, I know he will go do it because he

3    has got that reputation he has got to live up to.

4        Q.  So, there is no one else you're afraid of, it

5    is him you're afraid of?

6        A.  I'm not basically afraid of him.  To me, a

7    player is a player.  He bleed just like I bleed.  He

8    ain't no monster or anything.  It is just doing what

9    is right.  The guy nearly killed me, and I ain't going

10   to go get a gun looking for him -- which I would if I

11   got time to and I got money like him, but I ain't no

12   punk.  I ain't got no money, I ain't got no time to

13   get ten or twenty to life.  And I got me a car wash

14   business I run every day.  I don't have time.  I call

15   the phone and let them handle that.  With a broke man

16   like me, I only got 16 dollars in my pocket right now,

17   running around with a guy I know is sitting on

18   $100,000.  He's impossible to catch.  He change cars

19   every hour.  That one night they came at us in three

20   different cars.  I see different cars.  I can't say

21   it's them, but I had to be looking at every car,

22   because that's the type of person that he was.

23       Q.  You're saying before that night you had no

24   grievance with McHarry Lafontant?

25       A.  No grievance, nothing.  We were tight.  I

52

 1    know him and Les had a little problem, but I figure,

 2    "Hey, me and you partners," you know.  If he and Les

 3    had a problem, I think he would have did like a man

 4    and call me and said, "You're riding with Les, could

 5    you talk to him and ask him what happened between him

 6    and my cousin."  And he didn't tell me nothing.  You

 7    know what I'm saying?  He didn't call me.  That mean

 8    he ain't have no love or nothing for me.  He just

 9    came, I was with Les, and he was going to kill me too.

10    That's it.

11            MR. ROTH:  That's are the only questions I

12    have.

13            MR. CABRERA:  I have a question for him.

14                       CROSS EXAMINATION

15    BY MR. CABRERA:

16        Q.  Darren, listen to what I'm telling you.  This

17    is your only opportunity to give a statement to the

18    defense attorney.

19        A.  Okay.

20        Q.  That way, the record is real clear, because I

21    don't want any confusion when this goes to trial.  I

22    want you to tell the defense attorney, Mr. Roth -- I'm

23    giving you an open-ended question here.  I want you to

24    tell the defense attorney how that gun, the .9

25    millimeter gun, came about.  Tell him.

1      A.   Okay.   We're at the Take One, and the

2   shooting occurred, all right.   At that first incident

3   at Take One, Les said, "Man, I've got a friend stay up

4   the road, we are going to stop there, and I'm going to

5   try to pick up a gun, that way they don't catch up

6   with us and kill us."

7          So, what happened, we rode up to 92nd Street

8   or something like that, and we stopped at a yard, and

9   he came back, and he had a gun, but the fucking gun --

10   the gun didn't have no bullets.   So, therefore, when

11   Les found the gun didn't have no bullets, it's too

12   late.   He just leave it in the car.   He never had it

13   on him.   He never pull it out or nothing.   He just had

14   it.

15                    REDIRECT EXAMINATION

16   BY MR. ROTH:

17      Q.   So, Leslie went to a friend's house?

18      A.   Yes.

19      Q.   And where is the friend's house?

20      A.   Somewhere on 92nd, beside that school, Horace

21   Mann.   I'm not quite sure because it happened so fast,

22   but the Horace Mann Middle, it's -- the school start

23   on 89th Street and it is finished on 91.   It's

24   somewhere between them area.

25      Q.   It's between 89th and 91st Street?

54

1          A.   Yeah, somewhere around there.

2          Q.   And it's directly across the street from the

3    Horace Mann School?

4          A.   They are in the side of it.

5          Q.   The side of it.

6               What can you tell me about the house?  Has it

7    got a garage?

8          A.   No garage.  Pink, small little patio to the

9    side, a palm tree in the front, there was a car in the

10   front of the yard at the moment when we got there, but

11   I'm not sure.  I'm not sure if it was a Toyota

12   Corolla.  I don't know the color.  It was a dark

13   color, black or blue.

14        Q.   And did it have a driveway?

15        A.   Yeah.

16        Q.   A place for cars to park on the property?

17        A.   Yes.

18        Q.   And Leslie went inside?

19        A.   I'm not quite sure if he went in the house,

20   but he went around the house.

21        Q.   And he came back with a gun?

22        A.   I don't know, but he said he got one,

23   basically.  We didn't have one because we weren't

24   going to shoot nothing.

25        Q.   Where did he have the gun?

A. J. REPORTING SERVICES, INC.
(305) 386-4000

55

```
 1        A.   In the waste.

 2        Q.   He had it right in his waste?

 3        A.   Yeah.

 4        Q.   You saw it?

 5        A.   I didn't really see, but I know it was there.

 6   He ain't no faker.  He ain't going to tell me he got

 7   one and not have one.

 8        Q.   Nobody shot at you at that house?

 9        A.   No, nobody shot at us.

10        Q.   And your tire is already flat?

11        A.   Yeah.

12        Q.   The front passenger tire is flat?

13        A.   Yeah, passenger.

14        Q.   And then you drive from that house to a gas

15   station?

16        A.   To 95, about five blocks up further.

17        Q.   So that you could change the tire?

18        A.   Not really.  I went there so I could call my

19   girl to come get me, but when I went there, Les said,

20   "We might as well change the tire and get missing

21   quick."

22             I'm like, "Whatever you want to do."

23             But the jack -- what I had in my trunk at

24   that time, somebody switched it -- not switch it

25   purposely, but I lent somebody my jack and they give
```

56

```
 1    me their jack, and their jack couldn't lift the car

 2    all the way up.

 3         Q.   You knew that?

 4         A.   No.  See, we were stuck at that gas station

 5    for a good 20 or 30 minutes, you know, for them to go

 6    reload or come back.  I'm not sure if they ran out of

 7    the bullets at Take One.  They went to reload.

 8         Q.   This Barreta, this is not your car, right?

 9         A.   No.

10         Q.   How do you know someone had changed the jack

11    that you had lent it --

12         A.   Because I use this car regularly.  He is a

13    baser.  He is a regular person that I always use his

14    car.  I borrow his car.

15         Q.   Do you have another car of your own that you

16    use?

17         A.   I don't own a car.

18         Q.   You just use his car?

19         A.   Yeah, because I ain't got no license.

20         Q.   And you didn't try to change the tire at this

21    friend of Leslie's house who gave you guys the gun?

22         A.   No, because it was like 5:00 in the

23    morning -- no, 4:00 or 5:00.  It was about 5:00,

24    because we stopped at Take One like 4:45.  So, by the

25    time all that happened, it was like about 5:00.  And
```

1   Haitian people kind of funny.  You can't go to no

2   Haitian people and knock on their door at 5:00 in the

3   morning.  Their mama can make a whole lot of chaos.

4       Q.  But you can knock on the door and ask for a

5   gun?

6       A.  He didn't knock on the door.  He went around

7   the back and came back.  He probably went to his

8   window or something.

9       Q.  Okay.

10          MR. ROTH:  Those are my only questions.

11          MR. CABRERA:  Okay, that's it.

12          (Thereupon, the taking of the deposition was

13   concluded.)

14          (Reading, signing, and notice of filing were

15   not waived.)

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3

4    STATE OF FLORIDA)

5    COUNTY OF DADE  )

6

7          I, SOFIA CHEDIAK, Court Reporter Notary

8    Public in and for the State of Florida at Large, do

9    hereby certify that I reported the deposition of

10   DARREN JOLLY, taken before me at the time and place

11   stated in the caption thereof.

12

13         I further certify that said witness was duly

14   sworn according to law; that I am not of counsel to

15   any of the parties hereto, or otherwise interested in

16   said cause.

17

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand and affixed my official seal this 10th day of

20   November, 2002.

21

22

23   _____
     SOFIA CHEDIAK
     Court Reporter, Notary Public

24   My commission expires:  6/13/03

25

A. J REPORTING, INC

## STATE OF FLORIDA
### Department of Highway Safety & Motor Vehicles

**D river  A nd  V ehicle  I nformation  D atabase**

DIGITAL IMAGES ARE RESTRICTED TO LAW ENFORCEMENT USE PURSUANT TO
S. 322.142(4), FLORIDA STATUTES - IMAGES INCLUDE PHOTOGRAPHS AND SIGNATURES



**DRIVER LICENSE Transaction on 12-21-99**

**DL/ID Number**             **Class**
D410-435-73-285-0            E

**Name**
JAMAL PAUL DELVA

**Address**
7928 W ORLEANS ST
MIRAMAR, FL 33023-0000

**Date of Birth**       **Sex**    **Height**
08-05-73                M          6'02

**Restrictions**                **Endorsements**

**Fingerprint on file**
None

**Issue Date**          **Issue Time**
10-19-99                11:57:41

**Expiration Date**     **Duplicate Date**
08-05-06                12-21-99

**Conditional Messages**

**Form Number**
S069912210159

SAFE DRIVER

| Associated Application | Main | Return to Search |



Case 0:00-cr-06255-DTKH    Document 44    Entered on FLSD Docket 07/17/2003    Page 95 of 96

# STATE OF FLORIDA
## Department of Highway Safety and Motor Vehicles
*FOR USE ONLY AS AUTHORIZED BY DHSMV*



| DL/ID Number | Class | Status |
|---|---|---|
| L153-240-74-294-7 | E | VALID |

**Name**

FRANKI LAFONTANT

**Address**

5310 SW 57TH STREET
DAVIE FL 333140000

| Date of Birth | Sex | Height |
|---|---|---|
| 08-14-74 | M | 5'04 |

**Restrictions**

**Restriction Date**

**Endorsements**

**Expiration Date**

08-14-08

**Form Number**

S090206070035

**Issue Date**

06-07-02

**Duplicate Date**

06-23-94

**Conditional Messages**



Printed by Christopher B. Moon at 162.143.7.190 on 07-31-02



## POST TRIAL AFFIDAVIT OF DARREN JOLLY

I, Darron Jolly, date of birth: June 23, 1976, my address, 14411 NW 16th Avenue, Miami, Florida 33167 (786) 556-4771, having first been duly sworn do hereby depose and say as follows:

1. I was a witness against Mcharry Lafontant in his trial.

2. That I testified in Court that Mcharry Lafontant was one of the individuals who shot Leslie Estimable.

3. That I never actually saw who shot Leslie Estimable. I said it was Mcharry Lafontant at trial as per the instructions of Roger Cabrera.

4. I do not know who shot Leslie Estimable.

5. That the prosecutor promised that he would help me with my pending charge in Broward County for my testimony

6. As a result of my help in Dade County, the prosecutor helped me with the Broward County case. I was given a bond, when I had none

7. I was not charged with any weapons on the Dade County case.

8. My armed robbery charge in Broward County was eventually reduced to petty theft after I testified against Mcharry Lafontant.

9 This statement is being provided by me freely and voluntary because it's the truth and I want to set the record straight.

Further your affiant sayeth naught.



DARRON JOLLY

Sworn to and signed before me on this __1st__ day of __July__, 2003 by Darron Jolly who is personally known to me or has produced the following identification _____.

NOTARY PUBLIC

Marisela Caballero
My Commission CC996896
Expires January 28, 2005



DEFENDANT'S
EXHIBIT

CASE
NO. 00-6255-Ce-D1KH

EXHIBIT
NO.  1